The parties have flipped, but we're staying in the same place, and there's no cross-avail in this case, thankfully. Mr. Quinn. Thank you, Judge Bruce. May it please the Court, the Board's finding that the claims of the 668 patent are obvious is legally flawed and should be reversed. In a related proceeding over this patent, the ITC had found that Arista copied the patented features of Cisco's technology while willfully blinding itself to this patent, and it rejected challenges to the validity of the patent over the same Amara reference. Now, the Board here reached a different outcome for three independent reasons, any one of which requires a remand. First, it fundamentally misread the patent's requirement that packets destined to the control plane receive not just control plane port services, but also normal port services. Second, its analysis of secondary considerations of non-obviousness is legally flawed and misunderstands the legal significance of Arista's blatant copying of Cisco's feature names, command line expressions, all while happening while having access to Cisco's technology itself. And third, the Board failed to satisfy the APA's requirements for reasoned decision-making, particularly in addressing the issue of long-felt need and whether the core builder reference can satisfy the limitations the Board found missing from Amara, a point that the Board seems to assume in its opinion, but never actually addresses. Again, any one of these requires that the Board's decision be vacated. I guess getting to copying, the Board seemed to say just because the command line expressions and name of the product are the same, that's not enough. And then I guess they also considered the claim chart where you showed how there are various functionalities that correspond to functionalities of your client's product. Even if there's infringement, even if there's the same usage of various nomenclature, that's not enough to actually show copying as opposed to infringement. So that's a judgment call that they made based on the record in front of them. How do we necessarily reverse that, that the Board was compelled, in light of all the evidence, that they had to have found that there was actual intentional copying going on of Cisco's product? Sure, Judge Chen. Well, first, I think what the Board did here is much like what this court criticized recently in Institute Pasteur, where the Board, quote, stopped its analysis of the evidence of copying prematurely. And you know that the Board did this because the Board's conclusion on this matter in Appendix 33 is to say that neither the feature names nor the command line expressions are claimed in the 668 patent, and thus dismisses the evidence of copying as being very weak. The fact that the feature names and the command line expressions are not in the patent is beside the point. Neither are the user manuals which Arista copied, including down to the typos, and you can see that at Appendix 13-241. The point that the Board doesn't seem to actually grapple with is that when you have the copying of the same feature names, the same command lines, of the same user experience as their CEO, Arista's CEO, testified about, and you have the accused product giving you the same results, the only reasonable inference to draw is that the features were copied too. After all, if the user is using the same names and having the same look and feel and getting the same results, then the reasonable inference, this is classic circumstantial evidence. The reasonable inference is that you would conclude that the features themselves are copied. This is not a surprising conclusion for the Board to draw, given that you have Arista's CEO acknowledging that there's, quote, a lot of Cisco DNA in Arista, and this is at Appendix 11-802, and at 11-809, they designed their system where a Cisco user, quote, would be able to use Arista right away because we have similar command line interfaces and operational look and feel where we don't have to invent, we don't, end quote. Now, that's not the only error that the Board... This is creating an atmosphere of suggesting that they were copying, but at the same time, maybe what the Board's trying to say is we need something a little bit more to show actual copying of the elements of Cisco's product that ultimately create the same result that Arista's product is designing. And everything else that you're pointing to in the articles is really more about Arista's desire to have its products to be compatible with Cisco's products. Sure, Judge Shin, and to be clear, I'm not asking for a reversal on this issue. I'm asking for a remand in the sense that the Board just simply didn't follow through on the analysis. We're here under APA review, and where the Board's conclusion on all of this is to say, well, quote, neither the feature names nor the command line expressions are claimed in the patent. That's stunting the analysis. I understand they're not in the patent. That's not the question. The question is, does this provide circumstantial evidence of copying? And so I think the Board got off the train at too early of a stop, just like what happened in Institut Pasteur, and that's a reason enough for this court to remand. There's a similar issue with respect to long-felt need. And if you have the Board saying that Cisco, quote, never addressed whether the need was satisfied by another, that's Appendix 28, and it's suggesting that Cisco, quote, never asserted its products satisfied the long-felt need, Appendix 30. You can't reconcile that with the material we presented to the Board at Appendix 280, 283, 3637, 284, and 235. I think this issue comes down to how did you define what the long-felt need was, that there was this need that needed to be solved in the industry and that it hadn't been solved for a very long time, and so what was that need? And I thought your side had articulated as being trying to defend against these DOS denial-of-service attacks, and the claimed invention is really more about protecting the control plane against these sorts of flooding attacks. Well, and Judge Chen, I think the Board took an inconsistent approach to this. For example, in looking at some of the evidence on this issue, the Board said, well, the question was the fending off denial-of-service attacks for others. It said our evidence that others had failed wasn't sufficient because that didn't address whether or not they were solving the problem at the control plane. So the Board's reasoning, and this is articulated in our brief, is internally inconsistent on this point, and that, again, is yet another reason that the Board ought to be remanded. My concern is whether Cisco's arguments were internally inconsistent. No, I appreciate the question. I don't think that they were. I think Cisco's position was always that this was about mitigating denial-of-service attacks and doing so by protecting the control plane, and indeed that actually sort of feeds back into the principal argument here, or the first argument here, which is how is it that this is done? The claims require that packets destined for the control plane receive both the control plane port services and the normal port services, and you have to read B and D2, the element B and element D2 of the claim together. And specifically, if you look at element B of claim 19, it provides that one of the steps is, quote, executing port services on packets entering and exiting the physical network interface ports. That's not limited. It's not limited to some of the packets. That language is unqualified, and there is no path depicted in the specification. There is no example where a packet reaches the control plane without having both normal port services applied and control plane port services applied. I think that means that the decision here is inconsistent with this court's reasoning in cases like Enry-Smith and Vernetics and Simed, which required that you look at the claims, of course, in light of the specification itself. And indeed, under ordinary rules of grammar, when a noun is left unqualified, it applies without qualification. Now, another point here, if you look at the argument that Arista's making, and their argument is that, well, it's enough that some packets might receive normal port services. Well, under that rationale, you have to read B and D2 together. D2 says, quote, the control plane port services operate on packets. It also isn't modified. And so under their rationale, it would be enough that control plane port services were applied to only some of the packets. Number one, that makes no sense. That would be self-defeating. The whole point of this is to have enhanced protection for the packets that are going to the control plane. And if some of the packets going to the control plane are not going to get control plane port services, then the invention doesn't work. Second, it's inconsistent with the specification itself. If you look at column three, line 53 to 57, it contemplates that all of the packets are going to receive control plane port services. Packets always have to pass through the control plane port entity to ensure that those services are applied. That's what it says at column three, line 53. And there's a similar point at column four, line nine. What about column three, line 35 to 41, where it says port services are then typically applied to operate on packets entering into or exiting from each individual physical port? So Judge Chin, as we explained in our brief, I think what's being talked about there as being typical is what's typical is that packets are going to enter through the physical ports. There are obviously ways that packets can enter into a device. They could come by Wi-Fi and enter through an antenna. They're not always going to come through a physical port. And when it says typically there, it's talking about typical operation of the system. And that is what typically is referring to there. It's not suggesting that there are going to be circumstances in which packets are not going to receive normal port services. And that would defeat one of the purposes of the invention. You have an administrability issue. In addition to having enhanced protection for the control plane, the invention is about doing it in a way that, number one, does not sacrifice the effectiveness of transporting transit packets quickly. And number two, that it can be done in an administrable way, as opposed to having to go and tinker with all the different physical ports on a device. If you had a system where the packets headed to the control plane are not going to receive normal port services, then you'd have to reverse engineer and come up with a way for the control plane entity to provide the normal port services as well, which would vary potentially from port to port. If the court has further questions, I'm happy to take them. But perhaps if I could reserve the balance of my time for rebuttal, I can respond to... I have a little question. Please. D1 talks about a control plane port entity, so that a set of control plane port services can be applied thereto. So control plane port services are being applied to a control plane port entity. What does that mean? What does it mean to have control plane port services applied to the control plane port entity? Well, Judge Chin, just two points. First, so we're clear, I don't think anything on the arguments that I'm making today turns on this. No, I'm just trying to understand what is really going on in this claim. I appreciate the question. And I think that what's going on here is a reference to the packets that are coming through the control plane port entity, because that's going to be what's in transit. But even if it's referring back to the control plane port entity, that's another way of saying, well, that's where the control plane port services are going to be applied. Okay. Thank you. Thank you, Chief Judge Proust. I'd like to begin with the secondary considerations issue. Is that acceptable to the court? Yeah, because the copying is a little, the analysis is a little thin, is it not, given the evidence? With respect, I think there's two issues there. One is, is there substantial evidence to support the board's conclusion? It's a factual question. They made a factual determination. That is something that is given deference in the question of substantial evidence. And the record created by Cisco on this, they chose to create this, attempt to create a fog of the so-called culture of copying and all of that, without really tying it to the issue that they have to prove. And the board stuck them with that. The board said, we're not going to pay attention to all of this general things that have no nexus at all to the claims. We want to see evidence that actually has a nexus to the claim, which is what's legally required. And that was not provided. They chose to not provide. Are you saying if the board had gone the other way and found that there was copying, that they would have lacked substantial evidence to make that finding in the face of all the evidence? I'm not saying that. I'm saying their determination of the lack of substantial evidence based on this record is supported by substantial evidence, that their conclusion of a lack of copying. But there's a second question, too. And that is, let's assume the board had found evidence of copying. I believe under this record, that would not, and if the board had found that that evidence of copying had defeated the substantial evidence of obviousness, I believe that would be error. Because the only purpose of these so-called secondary considerations is really to prevent the hindsight combination of core builder and Amara. But what's important is below, they never ever challenged the motivation to combine core builder and Amara themselves. They challenged Hendel, which is not an issue here. But core builder and Amara, they did not challenge the motivation to combine that. And for good reason. Amara is a 3Com patent, and core builder is a 3Com router. And so they did not challenge that. So the relevance of secondary considerations at this point is minimal to nil. Its importance, its relevance is to prevent the hindsight combination, which is not challenged. And therefore it could not defeat a prima facie finding of obviousness, which the board properly made. But how do we know necessarily that the board's conclusion, whether or not it was a legal conclusion or factual conclusion, but that the board would not have, if they had construed the copying as being significant and real, would not have concluded that that was sufficient? You're right. We can't know what the board would have said. I think this court in that case, if the board had found prima facie case of obviousness, had found copying, and trumped obviousness based on copying, I believe that would be reversible error in this court as a matter of law. Because the relevance of copying is, as I say, to defeat this combination, which was not challenged. And the court has been very clear that these secondary considerations, although they must be considered, do not. Have we ever had a case that said that? That if you don't, I mean, let's just say for a moment. I'm not aware of one. Let's say we're using the phrase prima facie case loosely here because maybe we're not supposed to be. Understood. But in any event, right, there's no case. I'm not aware of one. But if you don't challenge the underlying grounds of the prima facie case, then you are barred from relying on secondary considerations. It's not barred. It's the court does say that. You have no claim to rely on secondary considerations. No. It's that the secondary considerations can't trump it. This court has said that many times, that even evidence of secondary considerations won't trump a strong case of obviousness. The court has said that for sure. And the court has said that the purpose of this copying of the secondary consideration is to try to negate a hindsight bias to combine references. And while the third step in that logical syllogism I don't think has ever been reached before, has ever been raised, it certainly hasn't been rejected by the court, but the third step in that syllogism is pretty straightforward. If the only relevance is to rebut the combination where the combination is not challenged, then I don't think it would be sufficient under this course precedent to rebut a strong case of obviousness. The board found a strong case of obviousness and said this weak evidence is not sufficient. That should be upheld, A, because the finding of weakness was supported by substantial evidence, but, B, even if the court disagreed, it would not be sufficient to trump the strong case of obviousness anyway under this course precedent. What if we disagree with both those arguments and say, okay, you know what? There was copying going on there. And secondly, we don't – we're not going to make a rule that says you can never attack a prima facie case when you don't – through secondary considerations if you don't attack the prima facie case itself. That's not the rule I'm suggesting. I'm suggesting that the evidence of copying and other secondary considerations would not be sufficient to overcome the strong case of obviousness. Well, that's a different statement. That's what I'm saying. Okay. That's what I'm saying. Now you're talking in terms of leapfrog where if you have a very strong case of a prima facie, then the secondary considerations aren't strong enough. That's what the board found. Well, the board found here that first it found that the copying was very weak evidence. True. And then it found – No, that's not right. It was actually pretty strong evidence. Then the question is would we have to remand that or would we still say, I guess in your view, nevertheless in the face of this very strong case of obviousness that even strong evidence of copying – That's my point. – cannot prevail in light of the strong case. That's my point. This court's precedents are clear that we have a very strong case of obviousness, and I would submit that precedent is even stronger where the relevance predicate of copying isn't there, that the evidence of the secondary considerations cannot then trump the strong case of obviousness. And this court has held that in many other contexts, and that holding would be sufficient to affirm even if you disagreed on copying. But I don't think you can, or should, because Cisco's record on copying is this sort of amorphous stuff. And what the board did was hold quite properly that the CLI – well, that was a copyright case that they lost – that that doesn't mean that the product and the specific functionality as claimed was copied, which is true. It's their burden to prove nexus between this amorphous stuff about copying and the claims, and they failed to do it. And they're stuck with their failure to do it. They chose to try to rely on that amorphous type of evidence, and the board properly held them to that and said that's not sufficient. The point on long-felt need, there's only two issues I want to talk about there. One is, and on copying, Cisco tries to suggest that the board's discussion on this is insufficient. But the board took the step here, which this court has blessed in the Pace case of February 1, of saying we adopt petitioners' reasoning as our own. That's the quote from the board, as our own. And so the mere fact that they didn't copy and paste the petitioners' arguments, which they cited – they cited the pages that they were adopting, quote, as our own – the fact that they didn't copy and paste it into their opinion is irrelevant under Pace. And so Cisco's complaint that the words used in the actual board opinion were not as effusive as they would like falls squarely under Pace, which says it is permissible if the board does say we adopt it as our own. They did so here. So all of their complaints about so-called inadequate discussion fall by the wayside in that case. What page did they say we adopted the petitioners' arguments as our own? I believe it was 24, but let me look. 22. Appendix 22. And that is the bulk of Cisco's criticism of the board's reasoning, and that wipes away the bulk of their criticism about that issue. With regard to Longfelt Need, there is only one other issue. This is about the combination of Amar and Kohlberg over there, right? No, it's about the whole issue of obviousness. Okay. I don't think there's any question about that. And the board cites two various portions of the petition in supporting various of the arguments throughout the discussion. And so if you look at page 22, we have reviewed the petition, the patent owner's response and petitioner's reply, as well as relevant evidence that sufficiently establishes petitioner's contentions for claims and lists the claims, and we adopt petitioner's contentions discussed below as our own. So it's not limited to combination of Kohlberg. They've talked about the position on the claims. I think that's very, very clear. With respect to Longfelt Need, Cisco argues that there's an inconsistency in the board's approach, and I think that's exactly wrong. The inconsistency was Cisco. The board correctly pointed out that the claims require protection at the control plane, and the board correctly pointed out that Cisco's evidence, supported evidence, of a quote-unquote Longfelt Need was not at the control plane level, where it should be, but at a general denial of service level. And they argued that that was not a sufficient nexus to the claims, which is true. And what the board then did to say it was also, by the way, this 2013 article that Cisco submitted, which shows there were still denial of service problems at the general level, shows that even under Cisco's position at the general level, it hadn't been solved. But what the board was correctly pointing out is that there was an inadequate amount of information that Cisco had provided to support its burden on Longfelt Need. That's all the board held. It's clearly true. I'd now like to turn to claim construction, if I may. So, claim construction, the question is whether the control plane packets have to have normal port services in addition to regular port services, in addition to control plane port services. And that, I would submit, is clearly inconsistent with the claims, and certainly inconsistent with the specification. But the starting point is that the standard here for the board is broadest reasonable interpretation. Cisco's interpretation is undeniably narrower. It's narrower because it adds a requirement that those control plane packets get an additional type of service, rather than merely having control plane services. So that's narrower, and the question then is... Is that what the specification says then? I disagree completely. So the specification, and it starts with the point that Your Honor raised at column 3, line 35, typically, typically certainly connotes, not always, that's not the end though, that's merely the starting point. And that is inconsistent with an argument that it has to always have normal port services applied. Column 2, line 63 to 66, squarely talks about a particular embodiment where a port has no configuration at all yet. And says in that context, if a port has no configuration, there are no normal port services. That's the whole point, it hasn't been configured. That's in the spec at column 2. And so that's a situation where control plane packets coming through that unconfigured port, described in the specification, would have no normal port services, would get control plane port services, and that's squarely inconsistent with Cisco's construction. Third, column 6, lines 24 to 32, talks about this administrator access during a denial of service attack. And that's referencing column, figure 5, and also column 6. That's a context in which there's a specific port which the administrator is going through, which doesn't receive any of the normal port services. And if you look at column 5, rather figure 5, I'm sorry, figure 5 is what that's describing. Figure 5 says, allow trusted host traffic, for example. And that's what column 6 is describing, as you're going to allow that traffic, regardless of whatever those port services are that may limit the rate or anything else, because it's, for example, an administrator who wants direct access during a denial of service attack, which makes complete sense. You wouldn't want the administrator subject to those port services when he's trying to access the control plane to fix it. And that's exactly what that's talking about in column 6. Column 7, lines 46 to 56, also inconsistent with Cisco's construction, because it's talking about, in the context of figure 5, that the packets would go to the control plane, quote, without rate limits. So the rate limits are the normal port services, not applicable to those control plane packets, because you want the administrator to be able to reach the control plane. But if there's any question about all of that, it's removed by column 6. Column 6, lines 36 to 42. And column 6, lines 36 to 42, could not be clearer. And I'll read it. Thus, the user is afforded significant control over the flow of traffic destined to the control plane, just as if the control plane were a hardware interface, since control plane-destined packets will invoke only control plane services, transit traffic and system performance is minimally impacted, since control plane-destined traffic will invoke only control plane services. There is no way to reconcile that statement with their contention that the plane must require normal port services, in addition to control plane services, being applied to those packets destined for the control plane. Impossible to reconcile. And that's the specification. It's also inconsistent with their own expert's testimony in the ITC, who read that claim language and said, I don't see it meaning that you have to apply normal port services to control plane packets. Do you know what it means to have services applied to ports? I think the normal, as I understand it, is that a port will be configured, so that, for example, a rate limit will be applied. So, if that rate limit is exceeded, that's a typical example of a normal port service, if that rate limit is exceeded, it will stop additional flow of those packets. It might be also, we're going to block packets from this source, because we deem it to be unreliable. That's a port service. That's a port service being applied to a port, but you could have ports that are not configured, and therefore none of that is happening, because it hasn't been configured to happen. That's what column 2 teaches us. And column 6 is square, telling us that it is not, that in many situations, control plane packets will only, only invoke control plane services. Cisco's evidence is primarily figures 4 and 6. The specification is unambiguous at columns 4 and 8, describing those figures, saying these are steps that may be performed. Okay. Not required. Time is up. Thank you. Thank you. So, we'll add a couple more minutes to your time to even out here. Thank you, Chief Judge Prost. Starting on the issue of secondary considerations and copying, I think it's very telling. Mr. Powers does not attempt to defend the Board's reasoning here, in terms of its analysis of copying. And, of course, we're here under APA review. And it's not enough for the Board to just simply say, I agree or I disagree. As this Court has made clear in a number of recent cases, like Icon Health, InRenewvasive, and recently Google versus Intellectual Ventures, the Board has to explain why it agrees and why it disagrees. And the point, by the way, that he points to on page 22, where the Board purports to adopt their initial contentions, well, none of that goes to any of the issues of copying. Because none of the stuff about copying would have been part of ERISTA's initial contentions. The suggestion from ERISTA that secondary considerations are just relevant to the issue of motivation to combine is unsupported by case law. It obviously goes to the ultimate question of obviousness. And what you have here is the Board engaging in a legally defective analysis. It did not even consider the inference. As this Court has articulated, when a party has access to the technology, there is a strong inference of copying that can be drawn. The Board does not address this. And if you accepted the Board's analysis here without sending it back for them to have to look at this more carefully, it would mean that you could never prevail on showing copying without direct evidence of copying the feature itself. That the notion of circumstantial evidence would be gone. Here, we're not dealing with amorphous evidence of copying. We are talking about evidence of copying the very feature names, the very command line expressions used by Cisco to implement the features of this very patent. And if the Board applies a proper analysis to copying, it will lead to a different analysis. Now, coming back to the question of claim construction, Mr. Powers makes a lot of arguments today, none of which, except for the last one, are in his brief. He does refer to the argument about Column 6, Lines 37 to 45. And we address this in our brief. He latches on to the first of the two sentences there. And we said that it is clear there's a misplaced modifier when you look at the second sentence. It defines what's going on in the first sentence. It says, that is, transit packets will not invoke control plane port services, but will continue to invoke normal input and output port services. That's all the sentence is saying. It's not that the control, what enhances the features here is not that control plane port services don't, excuse me, that control plane destined packets don't get normal port services. What enhances the operation is that normal transit packets don't also get the control plane port services. That's one of the things that the ART was improving. Now, in terms of some of the new arguments that we heard today, the point about Column 6 and Figure 5, ultimately there all this is saying is that the administrator can apply different kinds of control plane port services if you're coming from a trusted host. Just going back to Column 6, are you saying that the word only is a typo and we shouldn't read it to be there? I'm saying that what this is trying to say is that the control plane port services, excuse me, the control plane destined packets are the only packets getting control plane port services. The only packets that get control plane services are the control plane packets. That's exactly right. I realize that it is not a artful sentence, but when you look at the very next sentence, it very, very clearly explains exactly what it means. That is consistent, of course, with everything else in the specification. There is no reason to then ignore, by the way, the plain meaning of element B, which isn't modified to say some packets, and there was no response to the fact that if you read B that way, you'd have to read D2 that way. If you read D2 that way, that means some of the packets going to the brain, to the control plane, are not going to get control plane port services, and that makes no sense. These need to be read consistently. Thank you, Chief Judge Karst. Thank you very much. We thank both sides. The case is submitted, and we thank you for all your cooperation this morning.